580 S.E.2d 116

Sam B. McQUEEN, Respondent,

v.

SOUTH CAROLINA COASTAL COUNCIL, n/k/a South Carolina Department of Health and Environmental Control, Office of Ocean and Coastal Resource Management, Petitioner.

No. 25642.

Supreme Court of South Carolina.

Heard March 18, 2003.
Decided April 28, 2003.

144

Leslie W. Stidham, of Charleston; and John D. Echeverria, Hope Babcock, and Michael D. Beach, all of Washington, D.C., for petitioner.

Ronald R. Norton, of Conway; and Daniel J. Popeo, Paul D. Kamenar and R. Shawn Gunnarson, all of Washington, D.C., for respondent.

James S. Chandler, Jr., of Pawleys Island, for amici curiae South Carolina Coastal Conservation League, Sierra Club, National Wildlife Federation, and League of Women Voters of Georgetown County.

Nancy Bloodgood, of Young, Clement, Rivers & Tisdale, L.L.P., of Charleston; and Timothy J. Dowling, of Washington, D.C., for amici curiae Municipal Association of South Carolina and International Municipal Lawyers Association.

Kenneth E. Ormand, Jr., of Columbia; and Christopher G. Senior, of Washington, D.C., for amici curiae Home Builders Association of South Carolina, Home Builders Association of Hilton Head Island, Home Builders Association of Greater Columbia, Home Builders Association of the Low Country, Charleston Trident Home Builders Association, Home Builders Association of Horry–Georgetown, and the National Association of Home Builders.

James T. Young, of Conway; and J. David Breemer, of Sacramento, California, for amicus curiae Pacific Legal Foundation.

Justice MOORE:

This regulatory takings case is before us on remand from the United States Supreme Court to reconsider our previous decision [1] in light of *Palazzolo v. Rhode Island,* 533 U.S. 606, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001).

## FACTS AND PROCEDURE

In the early 1960's, respondent McQueen purchased two non-contiguous lots located on manmade saltwater canals in the Cherry Grove section of North Myrtle Beach. He paid

---

[1]. *McQueen v. South Carolina Coastal Council,* 340 S.C. 65, 530 S.E.2d 628 (2000).

$2,500 in 1961 for a lot on 53rd Avenue and $1,700 in 1963 for a lot on 48th Avenue. Since then, both lots have remained unimproved. The lots surrounding McQueen's are improved and have bulkheads or retaining walls.

In 1991, McQueen filed applications with petitioner Office of Ocean and Coastal Resource Management (OCRM)[2] to build bulkheads on his lots. After an administrative delay, he reapplied in 1993 requesting permits to backfill his lots and build bulkheads. In January 1994, a hearing was held at which the following facts were put into evidence.

At the time of the hearing, the majority of both lots had reverted to tidelands or critical area saltwater wetlands. This reversion was caused by "continuous" erosion, although little change had occurred since the permits were originally sought in 1991. The 53rd Avenue lot is inundated regularly by tidal flow all the way up to the street. The 48th Avenue lot has less tidal flow but contains more critical area wetland vegetation. On both lots, only some irregular portions of high ground remain.

The proposed backfill would permanently destroy the critical area environment on these lots. Without the backfill and bulkheads, the property does not have enough high ground to be developed. Eventually tidal water will reach the roads bordering these lots which will require bulkheads to protect the public roads.

In October 1994, a final decision[3] was issued denying both permits based on OCRM's evaluation of McQueen's lots as predominantly critical area wetlands.[4] McQueen then commenced this action seeking compensation for a regulatory

---

2. Formerly South Carolina Coastal Council.

3. The Coastal Zone Management Appellate Panel upheld denial of the permits.

4. S.C.Code Ann. § 48–39–130(C) (Supp.2002) provides that "no person shall fill, remove, dredge, drain or erect any structure on or in any way alter any critical area without first obtaining a permit from the department." Under § 48–39–10(J), "critical area" includes tidelands. "Tidelands" means "all areas which are at or below mean high tide and coastal wetlands, mudflats, and similar areas that are contiguous or adjacent to coastal waters and are an integral part of the estuarine systems involved." § 48–39–10.

taking. The master-in-equity found the denial of the permits deprived McQueen of all economically beneficial use of the lots and awarded him $50,000 per lot as just compensation.

OCRM appealed. By a divided court, the Court of Appeals affirmed the finding of a taking because McQueen was deprived of all economically beneficial use of his property. The majority held: "The definitive issue is what rights McQueen possessed when he purchased the lots and . . . the right to add a bulkhead and fill were McQueen's at the time of purchase." *McQueen v. South Carolina Coastal Council,* 329 S.C. 588, 595, 496 S.E.2d 643, 647 (Ct.App.1998). The Court of Appeals found the evidence insufficient, however, to support the amount of compensation awarded by the master and the case was remanded. OCRM then sought a writ of certiorari in this Court which was granted.

On review of the Court of Appeals' decision, we reversed. We found it was uncontested that McQueen was deprived of all economically beneficial use of his property but found he had no reasonable investment-backed expectations because of pre-existing wetlands regulations, therefore no taking had occurred. *McQueen v. South Carolina Coastal Council,* 340 S.C. 65, 530 S.E.2d 628 (2000). The United States Supreme Court then granted McQueen's petition for a writ of certiorari, summarily vacated our opinion, and remanded for further consideration in light of the recent *Palazzolo* decision.

*Palazzolo* involved a partial taking of property including wetlands. The Rhode Island Supreme Court found the landowner had not been deprived of all economically beneficial use of his property and, even if he had, the right to fill wetlands was not part of his ownership estate because regulations prohibiting such activity were enacted before he acquired title. *Palazzolo v. State,* 746 A.2d 707 (2000). On writ of certiorari, the United States Supreme Court reversed holding that pre-existing regulation was not dispositive in itself, either in the context of determining ownership rights under background principles of state law or in determining the investment-backed expectation factor in a partial taking. *Palazzolo,* 533 U.S. at 626 & 629–30, 121 S.Ct. 2448.

## ISSUE

Do background principles of South Carolina property law absolve the State from compensating McQueen?

## DISCUSSION

 First, we accept as uncontested that McQueen's lots retain no value and therefore a total taking has occurred.[5] When there has been a total deprivation of all economically beneficial use, the threshold issue in determining whether compensation is due is whether the landholder's rights of ownership are "confined by limitations on the use of land which 'inhere in the title itself.' " *Palazzolo*, 533 U.S. at 629, 121 S.Ct. 2448 (*quoting Lucas*, 505 U.S. at 1029, 112 S.Ct. 2886); *see also Rick's Amusement, Inc. v. State*, 351 S.C. 352, 570 S.E.2d 155 (2001) *cert. denied* 535 U.S. 1053, 122 S.Ct. 1909, 152 L.Ed.2d 819 (2002) (threshold inquiry in regulatory

---

5. Our analysis differs depending on whether a taking is characterized as partial or total. When there has been a partial taking by government regulation, the court determines if compensation is due by applying a complex of factors referred to as the *Penn Central* factors: the regulation's economic effect on the landowner, the extent to which the regulation interferes with reasonable investment-backed expectations, and the character of the government action. *Palazzolo*, 533 U.S. at 617, 121 S.Ct. 2448. Where regulation compels the property owner to suffer a physical occupation or deprives the owner of all economically beneficial use of his property, however, with "certain qualifications," compensation is due. *Palazzolo*, 533 U.S. at 617, 121 S.Ct. 2448; *see also Sea Cabins on Ocean IV Homeowners' Assoc., Inc. v. City of North Myrtle Beach*, 345 S.C. 418, 548 S.E.2d 595 (2001). In these two instances, the owner must be compensated "without case-specific inquiry into the public interest advanced in support of the restraint," a factor in the *Penn Central* complex. *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1015, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992).

*Lucas* left much confusion, however, about whether another *Penn Central* factor, "investment-backed expectations," survived in the context of a total deprivation case. *Compare Good v. United States*, 189 F.3d 1355 (Fed.Cir.1999) (this factor applies even in total deprivation case) *and Palm Beach Isles Assocs.*, 231 F.3d 1354 (Fed.Cir.2000) (*Lucas* eliminated this factor in total deprivation case), *petition for rehearing en banc denied* 231 F.3d 1365 (Gajarsa, J. dissenting); *see also Westside Quik Shop, Inc. v. Stewart*, 341 S.C. 297, 534 S.E.2d 270 (2000) (following *Good* ). *Palazzolo* has not clearly resolved this issue. In light of our disposition on the threshold issue of background principles of state law discussed below, we need not decide whether this factor applies to a total taking.

taking is whether the property interest affected is inherent in the plaintiff's ownership rights). Background principles of State property and nuisance law inform this inquiry. *Palazzolo,* 533 U.S. at 629, 121 S.Ct. 2448. Where the proscribed use is not part of the owner's title to begin with, no compensatory taking has occurred. *Lucas,* 505 U.S. at 1027, 112 S.Ct. 2886.

### *Public Trust Doctrine*

 As a coastal state, South Carolina has a long line of cases regarding the public trust doctrine in the context of land bordering navigable waters. Historically, the State holds presumptive title to land below the high water mark. As stated by this Court in 1884, not only does the State hold title to this land in *jus privatum,* it holds it in *jus publicum,* in trust for the benefit of all the citizens of this State. *State v. Pacific Guano Co.,* 22 S.C. 50, 84 (1884); *see also State v. Hardee,* 259 S.C. 535, 193 S.E.2d 497 (1972); *Rice Hope Plantation v. South Carolina Pub. Serv. Auth.,* 216 S.C. 500, 59 S.E.2d 132 (1950), *overruled on other grounds, McCall v. Batson,* 285 S.C. 243, 329 S.E.2d 741 (1985).[6]

 The State has the exclusive right to control land below the high water mark for the public benefit, *Port Royal Mining Co. v. Hagood,* 30 S.C. 519, 9 S.E. 686 (1889), and cannot permit activity that substantially impairs the public interest in marine life, water quality, or public access. *Sierra Club v. Kiawah Resort Assocs.,* 318 S.C. 119, 456 S.E.2d 397 (1995); *see also Heyward v. Farmers' Min. Co.,* 42 S.C. 138, 19 S.E. 963 (1884) (public trust land cannot be placed entirely beyond direction and control of the State); *Cape Romain Land & Improvement Co. v. Georgia–Carolina Canning Co.,* 148 S.C. 428, 146 S.E. 434 (1928) (protected public purposes of trust include navigation and fishery). The State's presump-

---

6. The State's presumptive title may be overcome only by showing a specific grant from the sovereign which is strictly construed against the grantee. *Hobonny Club, Inc. v. McEachern,* 272 S.C. 392, 252 S.E.2d 133 (1979). *Cf. City of Folly Beach v. Atlantic House Props., Ltd.,* 318 S.C. 450, 458 S.E.2d 426 (1995) (without considering public trust, compensation was ordered where it was uncontested plaintiff was "owner of record" of land below high water mark).

tive title applies to tidelands. *State v. Yelsen Land Co.*, 265 S.C. 78, 216 S.E.2d 876 (1975).

 Significantly, under South Carolina law, wetlands created by the encroachment of navigable tidal water belong to the State. *Coburg Dairy, Inc. v. Lesser,* 318 S.C. 510, 458 S.E.2d 547 (1995). Proof that land was highland at the time of grant and tidelands were subsequently created by the rising of tidal water cannot defeat the State's presumptive title to tidelands. *State v. Fain,* 273 S.C. 748, 259 S.E.2d 606 (1979).

 As described above, each of McQueen's lots borders a man-made tidal canal.[7] At the time the permits were denied,[8] the lots had reverted to tidelands with only irregular portions of highland remaining. This reversion to tidelands effected a restriction on McQueen's property rights inherent in the ownership of property bordering tidal water.

The tidelands included on McQueen's lots are public trust property subject to control of the State. McQueen's ownership rights do not include the right to backfill or place bulkheads on public trust land and the State need not compensate him for the denial of permits to do what he cannot otherwise do. *Accord Esplanade Props., Inc. v. City of Seattle,* 307 F.3d 978 (9th Cir.2002) (finding no taking where state public trust doctrine precludes dredging and filling tidelands). Any taking McQueen suffered is not a taking effected by State regulation but by the forces of nature and McQueen's own lack of vigilance in protecting his property.

---

**7.** While many of the cases cited above refer to land bordering "navigable tidal" water, under South Carolina law tidal water is presumed navigable unless shown incapable of navigation *in fact,* a showing not made here. *State v. Pacific Guano Co., supra.* The fact that a waterway is artificial is irrelevant since it is considered the functional equivalent of a natural waterway. *Hughes v. Nelson,* 303 S.C. 102, 399 S.E.2d 24 (1990).

**8.** The value of the interest in land is to be determined at the time of condemnation. *City of Folly Beach v. Atlantic House Props., Ltd.,* 318 S.C. 450, 458 S.E.2d 426 (1995). Condemnation occurred when the permits were denied by a final decision. *See Palazzolo,* 533 U.S. at 618. Regulatory delay does not give rise to a compensatory taking. *Sea Cabins, supra.*

We find no compensation is due. After reconsideration in light of *Palazzolo,* we reach the same conclusion we originally reached in this case and reverse the Court of Appeals.

**REVERSED.**

TOAL, C.J., WALLER, BURNETT and PLEICONES, JJ., concur.